**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| **JEFFREY JOSEPH PLACHE,** | ) | **Case No. 11 C 50071** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Hon. P. Michael Mahoney** |
| **v.** | ) | **U.S. Magistrate Judge** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.      Introduction**

Jeffrey Joseph Plache ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny his claim for Disability Insurance

Benefits ("DIB"), under Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This

matter is before the Magistrate Judge pursuant to the consent of both parties. *See* 28

U.S.C. § 636(c); Fed. R. Civ. P. 73.

**II.     Administrative Proceedings**

On April 7, 2008 Claimant filed for DIB, alleging an onset date of October 21,

2007. (Tr. 12, 94.) Claimant's initial application for DIB was denied on April 25, 2008.

(Tr. 58-61.) His claim was denied a second time upon reconsideration on September 18,

2008. (Tr. 68-71.) Claimant then filed a timely request for a hearing before an

Administrative Law Judge ("ALJ") on November 11, 2008. (Tr. 75.)

The hearing took place on March 25, 2010. (Tr. 32.) Claimant appeared and

testified with his attorney present. (Tr. 26-57.) Claimant's friend Peggy Rose was also

present and testified and Vocational Expert ("VE") Mr. Lee Knutson testified as well. (Tr. 45-56, 111-13.)

On April 28, 2010, the ALJ issued a written decision denying Claimant's application, finding Claimant was not disabled under sections 216 (i) and 223 (d) of the Social Security Act. (Tr. 21.) Appeals council denied Claimant's request for review on December 23, 2010. (Tr. 5.) Therefore, the ALJ's decision is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1455, 416.1481. Claimant filed a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. § 405(g).

### III.     Background

Claimant was born on September 18, 1953, making him fifty-six years old on the date of the ALJ's decision on April 28, 2010. (Tr. 114.) Claimant is 6'1" and weighs 210 pounds. (Tr. 158.) Claimant completed high school, has some college education, and was employed as a journeyman wireman electrician for thirty-six years. (Tr. 32-33, 160, 166, 199-200.) As an electrician, Claimant's most recent pay rate was thirty-two dollars per hour. (Tr. 160.) At the time of the hearing, Claimant lived by himself at his home in Rockford, Illinois. (Tr. 31, 52.)  Claimant alleges disability with an onset date of October 21, 2007, due to a number of impairments caused by seizures and sleep apnea. (Tr. 159.)

Claimant has not been employed since he was laid off on October 10, 2007,

eleven days prior to experiencing his first grand mal seizure[1]. (Tr. 33, 41.) Claimant has not applied for any other jobs since October 2007. (Tr. 33-34.)

At the hearing, Claimant stated he has a driver's license but has not driven anywhere since experiencing a grand mal seizure in October 2007. (Tr. 32.) When Claimant needs to run errands or see doctors he stated he will walk, ride his bicycle, or get rides from his father or his friends. (Tr. 32). Claimant testified that he can walk the five blocks to the grocery store on his own. (Tr. 44.) Claimant stated he is capable of doing all of his household chores and that his daily routine consists of staying around his home, where he tries to eat well and get exercise. (Tr. 42.) Claimant exercises by doing yard work (gardening, raking, mowing, and shoveling snow in the winter), taking short walks, or sometimes going for a short bicycle ride. (Tr. 42.) Claimant stated his hobby is gardening and also, once every other week, he meets with friends to play card games. (Tr. 44, 319.)

According to the Claimant, his seizures have affected his day-to-day life. (Tr. 34-36.) He can no longer work as an electrician because he must avoid climbing ladders or being around unprotected heights. (Tr. 33-34.) Claimant said he has not tried to find other employment because he "get[s] tired immediately" and his mind is "not what it used to be." (Tr. 34.) Claimant testified that he has trouble standing for long periods of time or walking for long distances without running out of breath. (Tr.41-42.) While Claimant has not had a grand mal seizure since December of 2007, he has had "spacing-

---

[1] Grand Mal Seizure, also known as a tonic-clonic seizure, is a tonic seizure accompanied by a clonic seizure. During a tonic seizure a person's muscles initially stiffen and they lose consciousness and the person's eyes roll back into their head as the muscles contract and the back arches. During a clonic seizure the individual's muscles begin to spasm and jerk.
Hopkinsmedicine.org
http://www.hopkinsmedicine.org/neurology_neurosurgery/specialty_areas/epilepsy/seizures/types/tonic-and-clonic-seizures.html

out" episodes which he also referred to as seizures[2]. (Tr. 35). These episodes cause Claimant to lose all control of his body and, on a few occasions, caused him to fall down and suffer bladder incontinence. (Tr. 35.) These episodes are preceded by a feeling of "déjà vu" and are accompanied by a subsequent "lost and confused" feeling. (Tr. 39.)

When Claimant experiences "spacing-out" episodes while he is alone, he is unable to tell how long they last and is unsure how frequently they occur. (Tr. 39-40.) His friend Peggy Rose testified that the longest episode she has witnessed lasted up to a minute and the majority of the episodes last from thirty to forty-five seconds. (Tr. 35, 47-49.) Ms. Rose testified that she and Claimant see each other about three days a week for a couple of hours at a time. (Tr. 45-46.) She had twice witnessed Claimant have "spacing-out" episodes which would begin by Claimant saying that he does not feel well. (Tr. 47.) Then minutes later, his head would go back, his eyes would roll in the back of his head, and he would start twitching. (Tr. 47.) Subsequently, roughly thirty seconds later, he would be back to normal and not know what had happened. (Tr. 47-48.) Ms. Rose also noted that she has witnessed Claimant experience less severe "spacing out" episodes, which entailed Claimant becoming incoherent for a short period of time (about half a minute) and then all of a sudden becoming alert and seemingly back to normal.

(Tr. 48.) Ms. Rose estimated that Claimant experiences these episodes anywhere from

---

[2] It is likely that Claimant is describing what is known as a petit mal seizure. A petit mal seizure is commonly called an "absence seizure". It is a brief disturbance of brain function due to abnormal electrical activity in the brain, where the individual typically appear to stare without moving. Hopkinsmedicine.org, http://www.hopkinsmedicine.org/neurology_neurosurgery/specialty_areas/epilepsy/seizures/types/absence-petit-mal-seizures.html

once a month to four-to-five times a year and she believed that the episodes become less frequent when Claimant is taking Depakote[3], which had been prescribed to him. (Tr. 50.)

Claimant's alcohol consumption is unclear. He testified that he has never had an alcohol abuse problem and emphasized that he only drank one-to-two beers a day until he was prescribed anti-seizure medication, after which he claimed he gave up drinking. (Tr. 36-38.) Claimant's medical record indicates that Claimant has reported to his physicians that he drank as little as one to three beers a day to as many as twenty-four to thirty beers a day prior to his October 2007 seizure. (Tr. 256, 259, 264, 290, 318, 252, 307.)

Finally, VE, Mr. Lee Knutson, testifying before the ALJ, stated that Claimant's past work as an electrician was medium[4] in physical demand and skilled with a specific vocational preparation ("SVP") of eight[5]. (Tr. 54.) The ALJ described a hypothetical individual of the same age and with the same work experience and education of the Claimant. (Tr. 54.) The hypothetical individual's exertional limitations included being able to: sit for six to eight hours out of the day, stand or walk at least six hours out of the day, lift and carry frequently up to twenty-five pounds, occasionally up to fifty pounds; frequently climb stairs and ramps, but could never climb any ladders, ropes, or scaffolds; could frequently, but not repetitively, do any balancing and must avoid concentrated exposure to activites involving unprotected heights and being around moving and

---

[3] Depakote (divalproex sodium) affects chemicals in the body that may be involved in causing seizures and was prescribed to Claimant by Dr. Afzal on August 26, 2008. (Drugs.com) (Tr. 349-50.)

[4] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work. 20 C.F.R. § 404.1567 (c)

[5] Specific Vocational Preparation means the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. An SVP of eight requires over four years up to and including ten years. 20 C.F.R. §656.3

hazardous machinery. (Tr. 54-55.) The VE found that the hypothetical individual as described by the ALJ would not be able to return to Claimant's previous work as an electrician. (Tr. 55.) The VE provided several other jobs such an individual could perform, including an assembler, a cleaner, and a general laborer; all of which existed in substantial numbers in the Illinois economy. (Tr. 55.) The VE noted that no transferable skills from Claimant's past work would exist. (Tr. 56.)

## IV.    Medical Evidence:

The Claimant's earliest medical records relating to his issues with seizures are from Swedish American Health System, dating October 21, 2007. (Tr. 256.) These records indicate that while taking a nap, Claimant fell out of bed and landed face down on the floor. (Tr. 256.) Once on the floor, Claimant began to shake, make noise, and foam at the mouth. (Tr. 256.) During this episode, Claimant experienced incontinence of urine and was unresponsive. (Tr. 256, 259.) The record indicates that Claimant has no recollection of this event and that once conscious, Claimant stated to Dr. Mohammed Afzal that he drank about three beers a day. (Tr. 256.) Dr. Afzal made a differential diagnosis of generalized tonic-clonic seizure, etiology could be alcohol induced. (Tr. 257.) Dr. Afzal recommended Claimant get an electroencephalography (EEG), a magnetic resonance imaging (MRI) of the brain and instructed Claimant not to drive, climb high in buildings, swim alone, or use heavy machinery for the time being. (Tr. 257.)

Additionally on October 21, 2007, Claimant was examined by Dr. Eugene A.

6

Silva, a cardiologist. (Tr. 262.) Claimant indicated that over the past couple of months he had experienced episodes of déjà vu, sometimes associated with tastes and smells. (Tr. 262.) The déjà vu episode on October 21, 2007 was followed by an episode of unconsciousness and abnormal movement. (Tr. 262.) Dr. Silva also noted that while Claimant was transported to the hospital, paramedics reported that Claimant's heart rate had dropped to nearly ten beats per minute. (Tr. 262.) However, no rhythm strips were available to confirm this, so Dr. Silva was uncertain as to whether this was a true bradycardic episode[6] or not. (Tr. 264.) Dr. Silva's diagnosis was that Claimant's history is consistent with seizure disorder, specifically possible temporal lobe seizures[7]. (Tr. 263.)

During a physical conducted by Dr. Shetal Patel on October 21, 2007, Claimant again described experiencing multiple (six-to-eight) déjà vu-like episodes accompanied with a certain sort of smell and taste in his mouth. (Tr. 252, 264.) These episodes caused Claimant to feel ill. (Tr. 264.) To cope with the ill feeling caused by these episodes, Claimant went to sleep and subsequently fell to the floor and began shaking. (Tr. 264.) During the physical, Claimant denied any prior history of seizures. (Tr. 264.) Dr. Patel noted that Claimant drinks two-to-three beers daily and that Claimant admitted that he used marijuana the previous day. (Tr. 264.) Dr. Patel opined that Claimant may have partial seizures with secondary generalization and that Claimant's seizure threshold may be lowered by insomnia and use of alcohol. (Tr. 265.) Regarding the bradycardia, Dr.

---

[6] Bradycardia is a resting heart rate of under 60 beats per minute. The heart usually beats between 60 and 100 times a minute in an adult at rest. Mayoclinic.com, http://www.mayoclinic.com/health/bradycardia/DS00947

[7] Temporal lobe seizures are seizures that originate in the two temporal lobes of your brain. The temporal lobes process emotions, fight-or-flight reactions, and are important for short-term memory. Some symptoms of a temporal lobe seizure may be related to these functions, including having odd feelings — such as euphoria, fear, panic and deja vu. Mayoclinic.com, http://www.mayoclinic.com/health/temporal-lobe-seizure/DS00266

Patel believed the lowered heart rate was likely a response to the seizure rather than the cause of the seizure. (Tr. 265.) Dr. Patel placed the Claimant on alcohol withdrawal protocol. (Tr. 266.) The Claimant's creatinine[8] was mildly elevated, which may have been related to his seizure; Dr. Patel put Claimant on IV fluids to remedy. (Tr. 266.)

On October 22, 2007 Claimant told medical student Jane Yu that he has smoked one joint of marijuana daily since he was twelve years old and has up to three beers every night before going to sleep. (Tr. 259.)

The EEG performed on October 22, 2007 returned normal results but did not rule out a seizure disorder. (Tr. 271.) An MRI performed on October 30, 2007 returned the following results:

> • A 2.6 x 2.0 X 2.7 cm presumed arachnoid cyst in the parasagital location at the junction between the left frontal and parietal lobes which causes some displacement of the underlying parenchyma with no underlying vessels seen coursing though; this appeared to have been present on prior CT studies of October 27, 2007 and July 28, 2005;
> • mild asymmetric periventricular white matter disease seen in the right frontal lobe, nonspecific, given Claimant's age; there was no acute intracranial disease indentified;
> • bilateral frontal, ethmoid and right sphenoid sinus disease.(Tr. 284-285.)

Following Claimant's October 2007 seizure, Claimant met with neurologist Dr. Afzal on November 13, 2007. (Tr. 252-253.)  Dr. Afzal noted that Claimant was started on Dilantin[9] a week after experiencing his October 2007 seizure. (Tr. 252.) Claimant stated he had not experienced any break-through seizures. (Tr. 252.) Dr. Afzal reported

---

[8] Creatinine is a chemical waste product that's produced by an individual's muscle metabolism. A serum creatinine test measures the level of creatinine in your blood and gives you an estimate of how well an individual's kidneys filter (glomerular filtration rate).

[9] Dilantin (phenytoin) is an anti-epileptic drug, also called an anticonvulsant. It works by slowing down impulses in the brain that cause seizures. Drugs.com, http://www.drugs.com/dilantin.html.

that Claimant usually drinks twenty-four cans of beer per day and has done so for the past

thirty years. (Tr. 252.) However, for the last twenty days he has not drank any beer and

denied experiencing any withdrawal signs or symptoms. (Tr. 252.) In Dr. Nafzal's

neurological exam, he reported:

> • Claimant was awake, alert and oriented times three;
> • Claimant's higher integrative functions that include immediate recall
> and five-minute recall were intact;
> • Claimant's short-term and long-term memory were intact;
> • Claimant's speech was fluent;
> • Claimant's language includes comprehension, naming, repetition, and
> fluency was intact.
> (Tr. 252.)

Additionally in November of 2007, Claimant saw Dr. Richard Deming, his

primary care physician, who noted that Claimant admitted he had been drinking

excessively before his hospitalization in October, up to thirty beers per day, but has not

had any since his hospitalization. (Tr. 307.) Claimant told Dr. Deming that he feels

overall better. (Tr. 307.) Dr. Deming recommended Claimant refrain from work and

driving until he is cleared by a neurologist. (Tr. 308.)

Claimant returned to the hospital on December 19, 2007 due to a possible seizure.

(Tr. 267.) Plaintiff was found seizing in his bed by his girlfriend who called 9-1-1. (Tr.

267.) Upon arrival to the hospital, Claimant was reported as extremely combative,

flailing his arms, and screaming at the staff. (Tr. 267.) Claimant denied any aura or "déjà-

vu" like experiences prior to the seizure. (Tr. 267.) Dr. Kelly Ann Cullen asked Claimant

if he was taking 100 mg of Dilatin as prescribed and Claimant adamantly stated he had

been taking his medications. (Tr. 267.) Claimant's laboratory report showed his

phenytion (Dilantin) level was subtherapeutic at 0.8. (Tr. 267, 277) Dr. Cullen diagnosed

seizures secondary to nontherapeutic levels of Dilantin and discussed at length to continue taking his prescribed medications. (Tr. 268.)

On March 7, 2008, Claimant visited Dr. Richard Deming. (Tr. 290-94.) Dr. Deming noted that Claimant denied any further seizures or fainting. (Tr. 290.) Claimant's neurological exam was unremarkable without focal findings. (Tr. 291.) Dr. Deming diagnosed generalized seizures "controlled", noting the current medical regime was effective. (Tr. 291.) He planned to continue the present prescription plan and recommended that Claimant follow up with Dr. Afzal to get cleared to drive. (Tr. 291.) Dr. Deming noted Claimant was feeling totally fine. (Tr. 296.) Dr. Deming also diagnosed alcohol abuse, even though Claimant had denied drinking alcohol in excess. (Tr. 290-91.)

Claimant met with Dr. Gerald K. Hoffman, a consulting medical examiner on June 17, 2008. (Tr. 318-19.) Dr. Hoffman opined the following:

- Claimant has significant difficulty with planning, organizing, sequencing, and abstracting;
- Claimant has permanent short and intermediate term memory loss and difficulty remembering new information;
- Claimant is neither a malingerer nor an alcoholic. (Tr. 318-19.)

In June of 2008, Claimant followed up with Dr. Deming regarding his seizures and alcohol abuse. (Tr. 322.) During the visit Dr. Deming noted:

- Claimant was stable and denied any break through seizures;
- Claimant's alcohol intake has greatly been reduced to an occasional beer;
- Claimant should follow up with Dr. Afzal to get cleared to work and drive. (Tr. 322.)

10

Dr. Marion Panepinto, a state agency physician, performed a Physical Residual Functional Capacity Assessment ("RFC") on July 3, 2008. (Tr. 326.) Dr. Panepinto concluded that Claimant could:

- occasionally lift and/or carry (including upward pulling) fifty pounds;
- frequently lift and/or carry (including upward pulling) twenty-five pounds;
- stand and/or walk (with normal breaks) for about six hours in an eight-hour workday;
- sit (with normal breaks) about six-hours in an eight hour workday;
- push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry. (Tr. 326.)

With respect to postural limitations, Dr Panepinto concluded Claimant could:

- frequently balance and climb ramps or stairs but could never climb ladders, ropes or scaffolds. (Tr. 327.)

The only environmental limitation Dr. Panepinto listed was that Claimant should avoid exposure to hazards (machinery, heights, etc.). (Tr. 329.) The RFC was reviewed and affirmed by Dr. Towfig Arjmand, another state agency physician, on September 17, 2008. (Tr. 355-57.)

Claimant visited Dr. Afzal in August of 2008. (Tr. 349.) During that visit Dr. Afzal noted the following:

- Claimant's Dilantin level was subtherapeutic at six;
- Claimant did not allege experiencing any break through seizures;
- Claimant was experiencing some dizziness;
- Claimant stated he was still having spacing out episodes when talking to his friends and family. (Tr. 349.)

Upon neurological examination of Claimant Dr. Afzal noted:

- Claimant's short-term and long-term memory was intact and language that included comprehension, naming, repetition and fluency was intact;
- neurological exam was nonfocal with a differential diagnosis of complex partial seizure/atypical absence seizure and behavior issues;
- MRI performed on Claimant showed no acute changes from the MRI of October 2007. (Tr. 349-50.)

11

Dr. Afzal planned to keep Claimant on Dilantin and also start him on Depakote. (Tr. 350.)

Claimant returned to Dr. Afzal in September 2008. (Tr. 361-63.) Dr. Afzal stated:

> Claimant had not seen any improvements with his spacing out episodes after having started Depakote;
> • Claimant was having some trouble with memory where he would forget names of his friends;
> • Claimant's neurological examination was nonfocal with similar findings as in August 2008;
> • Claimant was cleared to drive but cautioned to be careful while doing so, do no swimming alone and use no heavy machinery or climb any high-rise buildings;
> • Dr. Afzal's differential diagnosis was complex partial seizure/atypical absence seizure and pseudodementia. (Tr. 361-63.)

Also in September, Claimant had another EEG performed which had normal results, but did not rule out a seizure disorder. (Tr. 364.)

Claimant had an additional follow-up visit with Dr. Afzal in November 2008. (Tr. 358-60.) Dr. Afzal stated similar findings as the September visit other than that Claimant believed he was seeing improvements with his "spacing out" episodes. (Tr. 358-60.)

In December 2008, Claimant visited Dr. Deming for a follow-up of his seizures and alcohol intake. (Tr. 366-67.) Claimant complained of further memory loss. (Tr. 366.) Dr. Deming concluded Claimant was stable and was taking his medications as directed without any side effects. (Tr. 366.)

## V.    **Standard of Review**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence,

resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner."). The court may remand to the Commissioner where there is a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. 42 U.S.C. § 405(g).

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.    Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner normally proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors.

**VII.** **Analysis.**

    **A.** **Step One: Is Claimant Currently Engaged in Substantial Gainful Activity?**

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done for pay or profit. 20 C.F.R. § 404.1510. If the

claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ noted that the Claimant did earn money in 2008; however, the Claimant testified that this income was from a pension. (Tr. 31-32.) The ALJ held it was not determinable as to whether Claimant engaged in substantial gainful activity during 2008, and reserved a finding as to this issue. (Tr. 14.) However, since the ALJ's analysis cannot continue without a determination at this stage, this Court presumes the ALJ found that Claimant was not engaged in substantial gainful activity from the time of his alleged onset date to the present. Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

**B.      Step Two: Does Claimant Suffer From a Severe Impairment?**

Step Two requires a determination whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404 1520 (a)(ii). A severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520 (c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. Id. If the claimant suffers a severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends. Id.

In performing the Step Two analysis in this case, the ALJ found that Claimant has the following severe impairments: seizure disorder, history of alcohol and marijuana abuse, and sleep apnea. (Tr. 14.) The ALJ found the above impairments to be severe

because they cause more than minimal limitations on the claimant's ability to function. (Tr. 14.) The substantial evidence in the record supports the conclusion that Claimant had one or more severe impairments and the parties do not dispute this determination. Therefore, the ALJ's Step Two determination is affirmed.

**C.      Step Three: Does a Claimant have a Listed or Medically Equal Impairment?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1. The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing significant gainful activity. 20 C.F.R. § 404.1525 (a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves on to Step Four.

In performing the Step Three analysis, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt 404 subpt. P, app. 1 (Tr. 14-16.) With respect to listing 3.10 (sleep-related breathing disorders) the ALJ stated Claimant did not meet the requirements because there was no evidence that Claimant's sleep apnea caused him to experience short-term memory problems that rendered him unable to learn new information or that caused him marked restrictions in the areas of daily living, maintaining of social functioning, and maintaining conversation, persistence, or pace.

16

(Tr. 15.) Regarding listings 12.04 and 12.09 the ALJ found that Claimant's mental impairments do not meet or equal the required criteria. (Tr. 15.) The ALJ performed a full analysis of the "paragraph B" criteria and found that Claimant's mental impairments do not cause at least two marked limitations or one marked limitation and repeated episodes of decomposition. (Tr. 15-16.) Neither party challenged the ALJ's finding with respect to listings 3.10, 12.04 or 12.09, so this court affirms the ALJ's determinations of these listings.

Also at Step Three, the ALJ analyzed Claimant's seizure disorder under listing 11.02. (Tr. 15.) Listing 11.02 provides:

> *Epilepsy—convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.* With:
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

> Listing 11.02, 20 C.F.R. Part 404, Subpart P, Appendix 1.

In order to meet the requirements of a listed impairment, Claimant must meet all the elements of the listed impairment. *See Rice v. Barnhart*, 384, F.3d 363, 369 (7th Cir. 2004). The record indicates that Claimant suffered two grand mal seizures in October and December of 2007. (Tr. 256, 264, 267.) Outside of these two medically documented episodes, Claimant has failed to produce a detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least three months of prescribed treatment. (Tr. 15.) Neither party disputes the ALJ's finding regarding listing 11.02 and, considering the Claimant's record is absent documented descriptions which meet all elements of 11.02, the ALJ's finding is affirmed.

However, Claimant argues that the ALJ erred in analyzing his seizure impairments under 11.02 and urges that the ALJ should have used 11.03 analysis in the alternative. Listing 11.03 provides:

> *Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical*

17

> *seizure pattern, including all associated phenomena;*
> *occurring more frequently than once weekly in spite of at*
> *least 3 months of prescribed treatment.* With alteration of
> awareness or loss of consciousness and transient postictal
> manifestations of unconventional behavior or significant
> interference with activity during the day.

Listing 11.03, 20 C.F.R. Part 404, Subpart P, Appendix 1.

As noted above, Claimant must meet all the elements of a listed impairment to meet the requirements of that impairment. *See Rice*, 384 F.3d at 369. While Claimant did report aura-like episodes associated with petit mal seizures, he was unable to provide documentation as to the frequency and length of their occurrence. (Tr. 35.) He could give no accurate estimate as to how often or long the episodes last. (Tr. 35.) Ms. Rose testified that she estimated the lesser epileptic episodes occur four-to-five times a year which is a far cry from the weekly requirement in listing 11.03. (Tr. 209.)

Additionally, the ALJ recognized that the record indicated that, on two separate occasions, Claimant was not compliant in taking his proscribed antiepileptic medication[10]. (Tr. 268, 277, 299, 249, 253.) The documentation of Claimant's subtheraputic blood levels is significant considering that the introduction to the listing provides:

> Under 11.02 and 11.03, the criteria can be applied only if
> the impairment persists despite the fact that the individual
> is following prescribed antiepileptic treatment. Adherence
> to prescribed antiepileptic therapy can ordinarily be
> determined from objective clinical findings in the report of
> the physician currently providing treatment for epilepsy.
> Determination of blood levels of phenytoin sodium or other
> antiepileptic drugs may serve to indicate whether the
> prescribed medication is being taken. When seizures are
> occurring at the frequency stated in 11.02 or 11.03,
> evolution of the severity of the impairment must include
> consideration of the serum drug levels.

20 C.F.R. Part 404, Subpart P, Appendix 1, 11.00A.

Because the record and testimony indicate that Claimant not only failed to meet

all the elements of 11.03 but additionally may have failed to comply with the prerequisite

of strict compliance to his prescribed antiepileptic treatment plan required for 11.02 and

---

[10] Dilantin (Phenytoin)

11.03, there is no reason for this Court to remand the ALJ's decision to apply listing

11.03. Consequently, the ALJ's decision at Step Three is affirmed.

### D.    Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?

In performing the analysis for Step Four, the ALJ determines whether the

claimant's residual functional capacity ("RFC") allows the claimant to return to past

relevant work. Residual functional capacity is a measure of the abilities which the

claimant retains despite his or her impairments. 20 C.F.R. § 404.1545 (a). The RFC

assessment is based upon all of the relevant evidence, including objective medical

evidence, treatment, physicians' opinions and observations, and the claimant's own

statements about his limitations. Id. Although medical opinions bear strongly upon the

determination of RFC, they are not conclusive; the determination is left to the

Commissioner who must resolve any discrepancies in the evidence and base a decision

upon the record as a whole. 20 C.F.R. § 404.1527 (e)(2); *see Diaz v. Chater*, 55 F.3d 300,

306 (7th Cir. 1995).

The ALJ found Claimant has the RFC to perform medium work as defined in 20

C.F.R. 404 § 404.1567(c), except he cannot perform complex tasks; can stand/walk for at

least six hours out of an eight-hour work day; sit for six to eight hours per day; lift/carry

up to fifty pounds occasionally and twenty-five pounds frequently; frequently climb

stairs/ramps or balance; cannot climb ladders, ropes, scaffolds, or high-rise buildings;

work around heavy machinery; and must avoid concentrated exposure to all hazardous

machinery and heights. (Tr. 16, 19.) Since Claimant's past relevant work as an electrician

required him to perform complex tasks, climb ladders, and work around heights, the ALJ

held Claimant is unable to return past relevant work. (Tr. 19.) The ALJ's RFC

determination is supported by the following substantial evidence in the record:

- Claimant has not experienced a grand mal seizure since December 2007. (Tr. 290.)
- Several of Claimant's laboratory reports following his December 2007 grand mal seizure show his phenytion (Dilantin) level was subtherapeutic, which indicates that Claimant was not compliant in taking his medication as prescribed. (Tr. 267, 277.)
- In March of 2008 Dr. Deming opined that the current medical regime was effective. (Tr. 296.)
- Claimant lives alone and follows a daily routine which consists of performing household chores (cooking, cleaning, dressing and bathing) and exercising;
- Claimant exercising by doing yard work (gardening, raking, mowing and shoveling snow in the winter), taking short walks or sometimes going for a bicycle ride. (Tr. 42.)
- Claimant can walk five city blocks to do his own grocery shopping. (Tr. 43.)
- Claimant's treating physicians opined several times that Claimant was stable and feeling better. (Tr. 307, 322-24, 358.)
- Claimant's neurologist found his short- and long-term memory to be intact on three separate occasions. (Tr. 253, 349, 358.)
- None of Claimant's treating physicians or medical experts indicated that Claimant is more physically limited than already accommodated for by the ALJ.
- Dr. Panepinto conducted a RVC assessment and concluded that claimant could perform unskilled, medium work with limitations including:
  - occasionally lift and/or carry (including upward pulling) fifty pounds;
  - frequently lift and/or carry (including upward pulling) twenty-five pounds;
  - stand and/or walk (with normal breaks) for about six hours in an eight-hour workday;
  - sit (with normal breaks) about six-hours in an eight hour workday;
  - push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry. (Tr. 326.)
  - frequently balance and climb ramps or stairs but could never climb ladders, ropes or scaffolds. (Tr. 327.)
- Dr. Panepinto's RVC determination was reviewed and affirmed by Dr. Arjmand. (Tr. 290-91.)

After review of the medical evidence, the ALJ's RFC is supported by substantial

evidence in the record and finding Claimant's arguments against the ALJ's Step Four

analysis unpersuasive, the ALJ's determination as to Step Four of the analysis is

affirmed.

20

**E.      Step Five: Is Claimant Capable of Performing any Work Existing in Substantial Numbers in the National Economy?**

At Step Five, the ALJ relied on Claimant's age, education level, work experience, medical record and the testimony of Vocational Expert Lee Knutson to determine if Claimant could perform substantial gainful work that exists in the national economy. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2, Rule 201.21, 201.28.

The ALJ provided the VE with a hypothetical individual who is fifty-six years old, with the work and educational experience of the Claimant and the exertional and environmental limitations of the Claimant as listed above. (Tr. 54-55.) The VE stated that individual would not be able to return to perform Claimant's previous occupation of an electrician. (Tr. 55.) However, the VE reported 99,000, unskilled, medium labor jobs[11] that the hypothetical individual could perform which exist in the Illinois workforce. (Tr. 55.) The ALJ then added that the hypothetical individual could do no complex work, driving, climbing or work near heavy machinery; the VE did not believe these limitations would preclude the individual from any of the jobs he previously listed. (Tr. 55-56.) Finally, the ALJ limited the individual to light work and asked for examples of jobs available. (Tr. 56.) The VE noted that in the State of Illinois at the light level about 64,900 positions[12] existed. (Tr. 56.)

Claimant argues the ALJ's finding that Claimant could perform medium work is patently wrong because of her reliance on the Claimant's ability to do household chores as evidence of his ability to perform substantial gainful activity and Claimant maintains the ALJ failed to consider the effect of his seizure disorder on his ability to hold a job.

---

[11] 26,000 assembling jobs, 52,000 cleaning jobs and 12,000 general labor positions. (Tr. 56.)
[12] 36,000 assembling positions, 8,900 checking/inspecting positions and 20,000 light cleaning. (Tr. 56)

However, the ALJ reasonably relied on the VE's testimony, the Claimant's age, education, work experience, and medical record to determine there are jobs that exist in significant numbers in the national economy for which the claimant has the ability to perform all or substantially all of the required exertional demands. (Tr. 20.)

Additionally, Claimant maintains that the ALJ credibility determination of the Claimant was patently wrong, largely due to the ALJ's fixation on the Claimant's alcohol intake prior to his October 2007 seizure. When assessing the credibility of a claimant's statements about his or her symptoms, including pain, the ALJ should consider the following in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes of has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Social Security Ruling 96-7p; see 20 C.F.R. § 404.1529 (c).

The record contains inconsistent reports of Claimant's alcohol intake ranging from as high as thirty beers a day prior to his October 2007 seizure to as low as one to three beers a daily after his October 2007 seizure. (Tr. 252, 307, 290-91, 322.) Claimant argues that the ALJ gave no explanation for assessing the reports of high consumption with greater weight than the reports of low consumption. However, the ALJ explains in her decision that the reports of high alcohol intake were given more weight because both

22

came from doctors who have a history of treating Claimant, including one from his primary care physician, Dr. Deming, whereas Dr. Hoffman's opinion was assessed little weight because he only met with Claimant on a single occasion. (Tr. 17, 19, 307.) ALJ's are afforded credibility determinations with special difference and therefore the ALJ's credibility determination of the Claimant cannot be overturned as patently wrong because her finding is supported by medical reports in the record. *See Powers v. Apfel*, 207 F.3d 431 (7th Cir. 2000); (Tr. 252, 307.)

This Court finds that the ALJ created an accurate and logical bridge between the evidence in the record and her conclusions that Claimant has not been under a disability, as defined in the Social Security Act, from October 21, 2007, through the date of her decision. (Tr. 20.) 20 C.F.R. 404.1520(g). Therefore, the ALJ's Step Five determination is affirmed.

**VIII.   Conclusion**

In light of the forgoing reasons, the Commissioner's motion for summary judgment is granted and Claimant's motion for summary judgment is denied.

**ENTER:**

_____

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE: July 8, 2013**